LIDA BUSH, APPELLANT, v. EBENEZER E. MOCKETT ET AL., APPELLEES.

FILED MARCH 13, 1914.   No. 17,569.

1. **Injunction: USE OF PROPERTY.** Every one has the right to any beneficial use he may see fit to make of his own property, if the benefit he seeks is not out of all reasonable proportion to the injury caused to another.

2. ———: ERECTION OF FENCE. A landowner will be enjoined from erecting a fence on his land to the great damage of his neighbor, and without any useful purpose on his part, but for the sole purpose to annoy and punish the party injured.

3. ———: ———: EVIDENCE. The evidence in this case, which is indicated in the opinion, is *held* to justify such injunction.

APPEAL from the district court for Lancaster county: P. JAMES COSGRAVE, JUDGE.  *Affirmed.*

*Burr, Greene & Greene,* for appellant.

*Mockett & Peterson, contra.*

SEDGWICK, J.

The plaintiff began this action in the district court for Lancaster county to enjoin the defendants from interfering with the plaintiff in the erection, repairing and rebuilding of a fence which the plaintiff and her husband desired to maintain on or near the line between the residence lot of the plaintiff and that of the defendants.  The defendants answered by way of cross-petition, alleging that while the defendants were away from home the plaintiff erected a rough, unsightly board fence between the lot occupied by the residence of the defendants and the lot so occupied by the plaintiff; that the fence was "about six feet high from the front sidewalk for fifteen feet back, and for the rest of its extent  *  *  *  was seven feet high; that the fence ran within about seven and one-half feet of the full west side of defendants' house; that the fence shut out the light, air, and view from the defendants' windows, and that defendants were unable to see the street or street cars or to have any view whatever from the windows on the west side of their house; and that the view was cut off from their front porch and front yard to the west and northwest," with other allegations as to the injury that the fence caused to the defendants, and then alleged "that the fence was not only high, but was made out of as rough material as possible, and was made for the express purpose of annoying and disturbing defendants and the members of their family, and was erected for no useful purpose."  It was further alleged that the fence "was placed on, over and along said lot line, immediately on the west of defendants' house, maliciously and out of spite, and for the express purpose of harassing defendants and their family, and for the purpose of annoying them and disturbing their peace of mind, and for the

purpose of decreasing the value of their said property, and for the purpose of compelling them to sell their property for a less amount than it was really worth." The defendants asked that the plaintiff be enjoined from maintaining the fence. The reply denied the allegations of the cross-petition. The trial court enjoined the plaintiff from maintaining a specified portion of the fence, and enjoined the defendants from interfering with the remainder thereof. The plaintiff has appealed.

The defendants alleged that that part of the fence which the plaintiff is enjoined from maintaining extended in some points on to defendants' land, and that their placing and maintaining it there constituted a trespass. Several witnesses testified that some of the fence posts, and especially the cement in which the posts were set, extended on to the defendants' land about two inches. The county surveyor, who was called upon to make exact measurements for the purpose of determining this point, testified that he found one or two of the posts that were set a fraction of an inch on the defendants' land, and that no part of any of the fence extended more than two inches over the defendants' land. This variation is so slight that it does not appear to be considered as a material matter in the controversy. There are then but two questions, one of law and one of fact, involved in the case: First. Can a landowner erect any structure that he sees fit, without any useful purpose on his part, but for the sole purpose to annoy and punish his neighbor, when his neighbor is severely damaged thereby? Second. If this question of law is answered in the negative, was this fence built without any useful purpose on the part of the plaintiff, and for the sole purpose of annoying and punishing the defendants?

1. The common law of England strenuously adhered to the doctrine that the owner of real estate might use it as he pleased, without regard to the convenience or even the interests of his neighbors. Some exceptions were made as to "ancient lights," and perhaps other such considerations. This rule of the common law was not quite in har-

mony with the theory of the civil law as expressed in the maxim, *"Sic utere tuo ut alienum non lædas."* The earlier decisons in this country are inclined to the English view; but in recent years there have been some very notable departures from the strict rule of those courts. In 1909 the supreme court of North Carolina said that the maxim above quoted "is not founded in any human statute, but in that sentiment expressed by Him who taught good will toward men, and said, 'Love thy neighbor as thyself.' * * * No one ought to have the legal right to make a malicious use of his property for no benefit to himself, but merely to injure his fellow man. To hold otherwise makes the law an engine of oppression with which to destroy the peace and comfort of a neighbor, as well as to damage his property for no useful purpose, but solely to gratify a wicked and debasing passion." *Barger v. Barringer,* 151 N. Car. 433. The opinion cites several Michigan cases and others, and is the subject of a somewhat extensive note, 25 L. R. A. n. s. 831.

Many of the states have by statute adopted the rule so announced. In 1888 the supreme court of Michigan, in the absence of any statute on the subject, declared the law of that state to be: "A fence erected maliciously, and with no other purpose than to shut out the light and air from a neighbor's window, is a nuisance." *Burke v. Smith,* 37 N. W. 838 (69 Mich. 380). The opinion by Mr. Justice Morse reviewed some of the earlier decisions upon both sides of the question, and stated at some length the reasons for the conclusions reached by the court. Chief Justice Campbell dissented. He discussed the common law doctrine of "ancient lights," and says that the right to have one's prospect into defendant's property left unobstructed "is an easement in the strictest sense of the term. * * * No man can create an easement for himself. If he has no such right, then he cannot complain that it is interfered with, either at law or in equity." He concludes that, where no such right has been acquired by prescription, "there is nothing to prevent the erection of any fence or barrier" to obstruct it. The doctrine of

"ancient lights" has not been recognized in this state, and the reasoning of the great chief justice does not seem to have application here. Mr. Justice Champlin concurred in the dissenting opinion; but he based his opinion upon the earlier decisions of that and other courts, and said that it should be left to the legislature to declare the remedy, and that he thought "that legislation of the character contained in the statutes above cited is required and would meet my hearty approval." In *Flaherty v. Moran*, 81 Mich. 52, the rule established in *Burke v. Smith, supra*, was affirmed and followed, and Justice Champlin, then being chief justice, concurred in the opinion. These decisions are followed in *Kirkwood v. Finegan*, 95 Mich. 543, and *Peek v. Roe*, 110 Mich. 52.

No doubt every one has the right to any beneficial use he may see fit to make of his own property, if the benefit he seeks is not out of all reasonable proportion to the injury caused to another. His neighbors have no legal cause to complain although it may interfere with some privileges formerly enjoyed. Courts of equity would fail in the service that history shows they were intended to render to society if they are unable to protect those common rights which more clearly appear, and become more valuable, as civilization advances and the relations of social life become more intricate and more enjoyable. As was said by Mr. Justice Hoke in his dissenting opinion in *Barger v. Barringer, supra*, we cannot "allow causes of action to be based upon motive alone. For here we enter upon the domain of taste and temperament, involving questions entirely too complex, varied, and at times fanciful for satisfactory inquiry and determination by municipal courts." But when it appears that, not only was the motive wholly malicious, but the intention and result were to seriously injure another, without benefit to any one, courts of equity are not so impotent in these modern times that they are unable to prevent such a wrong. That the defendants would be seriously injured by this act of plaintiff is shown without contradiction. Several disinterested witnesses testified that the value of

the defendants' property would be affected to the amount of at least $500, and without benefit, but rather injury, to the plaintiff herself.

2. The question, then, remains whether the evidence in this record proves that this plaintiff erected and sought to maintain this fence, not for any useful purpose on her part, but for the sole purpose of maliciously injuring and annoying the defendants. The plaintiff was the owner of lot 9 and the defendants were the owners of the adjoining lot 8, fronting to the north on South street in the city of Lincoln. It is strictly a residence locality, several blocks distant from any business section of the city. It appears that the defendants were required to lay a cement walk in front of their lot, the grade of which was fixed by the city authorities. This grade so fixed was about 4 inches higher than the cement walk which connected with it, and which had been laid by the plaintiff in the front of her lot, so that the plaintiff would be required to raise her walk to meet the walk of the defendants. The plaintiff seriously objected to this, and insisted that the defendants' walk should be laid to the grade of her walk. When the defendants were not allowed to do this, the plaintiff declared that, if she was compelled to raise the grade of her walk, she would erect a fence between the lots. Mr. Bowery, the paving inspector for the city, testified that the plaintiff and her husband seemed very indignant because they were required to bring the sidewalk up to the level; that he had instructions to require them to raise it, and told the plaintiff and her husband so, and that the plaintiff's husband said: "That when they brought the sidewalk up then up would go a high board fence." Another witness testified that he was working under a contract with the city in raising the plaintiff's walk, and, while so employed, the plaintiff told him that "she was going to put up a fence on the east side of her place," and that she "was going to put the names of Mr. Bates, I believe his name was, the assistant city engineer, and Mr. Bowery and all who had anything to do with the raising of that sidewalk, * * * on the

fence." This and other evidence of the same character is not contradicted. Soon after that the fence in question was built. It was a tight board fence about 6 feet high from the street north of the house to the line of the front of the defendants' house, about 15 feet, and from that point it was about 7 feet high between the houses. It was built by nailing stringers on round cedar posts and nailing inch boards to these stringers; the posts and stringers being on the side toward the defendants' house. The stringers and posts were dressed lumber, and were painted a dark green color. The fence is placed about 7 feet from the defendants' house, and reached about the middle of the windows of their living rooms. Before this fence was built the defendants had placed a wire fence on this line. This fence was built of iron rods and wires, about 3½ or 4 feet high. The plaintiff's husband, while on the witness-stand, was several times asked what their purpose was in building this fence, and whether it was intended to serve any useful purpose. Upon objection of plaintiff's counsel, he was not required to answer, and there was no attempt to show any useful purpose or any other object in building the fence than to punish the defendants and others for causing the plaintiff to raise their walk, unless it can be inferred from the evidence that the plaintiff once stated that she had the fence built for privacy and to avoid the taunts of the defendants.

There was already a fence on the line between these lots which is not complained of, and which was apparently suitable. The evidence shows beyond any question that the plaintiff's fence was not built for any useful purpose to promote their own convenience or welfare in any way, but for the sole purpose of annoying and punishing the defendants. Soon after the fence was constructed the defendants forcibly removed it, breaking some of the boards in doing so. The plaintiff rebuilt it, and it was again torn down. This action on the part of the defendants is seriously complained of in the briefs, and we have no inclination to approve of this conduct. This is not the form of action usually employed to redress such grievances,

and no relief is asked for in the nature of damages for injury to plaintiff's property. As that part of the fence will not be rebuilt, there is no occasion for any further action on the part of the court in this case. The trial court enjoined the plaintiff from reconstructing or maintaining that part of the fence extending north of the front line of the defendants' house, and enjoined the defendants from interfering with the remainder of the fence. The defendants have not appealed, and, as we have seen, the plaintiff was rightly enjoined.

The judgment of the district court is

AFFIRMED.

REESE, C. J., dissenting.

I agree that, if plaintiff placed any part of her fence over the lot line on defendants' property, defendants had the right to remove it where it thus encroached, or by injunction restrain the trespass. To that part of the opinion of the majority which holds that, if an adjoining lot owner, prompted alone by spite and a desire to annoy the adjacent lot owner, and for no useful purpose, should erect or should construct an unreasonably high fence, whether upon the lot line or his side of the line exclusively, equity could in a proper case protect the rights of the adjoining lot owner from what would be, in effect, a trespass. But I am fully persuaded that, so long as one keeps upon his own property, he has the right to the free use thereof, within reason, and to some exercise of his own judgment and preference as to the exercise of such use. If the use is lawful and within his rights, it is not for the courts to inquire as to his motive.

It does not strike me that the fence was so unsightly as to shock the sensibilities of any one, however refined they might be. The fence was 6 feet high, constructed of material planed and dressed upon both sides, and painted a dark green color, which is not an objectionable color. The decree of the district court, and indeed of this court, orders no interference with plaintiff's fence opposite the windows of defendants' house. That ques-

tion is not before this court, for defendants have not appealed from that part of the decree. It therefore has no place in this case. The decree only prevents the maintenance of *any* fence from a point opposite the front of defendants' porch to the front lot line, which is a distance of some 15 feet. Such a fence could not seriously interfere with the free circulation of the atmosphere, and the only possible interference with defendants would be to prevent them from observing everything existing or taking place in plaintiff's front yard, and probably a view along the surface of the earth in the street, neither of which is of so valuable a right as to enable defendants to dictate to plaintiff as to how she shall use or enjoy her own home and property. It is apparent that every right of which defendants are deprived (that of inspecting plaintiff's front yard, and looking along the street) is equally destroyed, so far as plaintiff is concerned, for she cannot oversee and inspect defendants' front yard, nor observe what is doing along the street, but in the opposite direction. The inconvenience of defendants is no greater than that of plaintiff. By this decree all semblance of privacy in front of plaintiff's house upon her own property is destroyed. If desired by plaintiff, I do not believe the court has any possible authority to enjoin the construction of the fence upon her own property, for her own benefit and convenience. To my mind the case is too trivial to warrant any such interference as is here proposed.

LETTON, J., dissenting.

While I agree with the modern doctrine, I think the motive is not material, unless the structure is offensive, unsightly, or is built for no useful or proper purpose. If the fence was lawful, proper, and not unsightly, the courts should not interfere.