# DAHL v. UTAH OIL REFINING CO.

No. 4478.   Decided June 20, 1927.   Rehearing Denied December 29, 1927.   (262 P. 269.)

2

*Ball, Musser & Mitchell,* of Salt Lake City, for appellant.

*H. L. Mulliner,* of Salt Lake City, for respondent.

CHERRY, J.

This is an action for damages to real property on account of an alleged nuisance. The plaintiff had a verdict and judgment for $500, from which defendant has appealed. The case went to the jury upon the issue of whether the plaintiff's dwelling house had been rendered uncomfortable and undesirable for residence purposes and its value thereby depreciated, in consequence of gases, odors, and fumes being carried to and discharged thereon, from an oil refining plant operated by defendant.

There are numerous alleged errors occurring during the trial which the appellant has assigned and argued, but we

deem it necessary to consider only the main question of whether the evidence sustains the verdict, which question was raised by a request for a directed verdict for the defendant and by a motion for a new trial.

The plaintiff's property consists of a 4-room dwelling house situated at the southwest corner of the intersection of Seventh North and Third West streets in Salt Lake City. It has been for many years, and was at the time of trial, occupied by the plaintiff and her children as a dwelling house. The oil refining plant of the defendant was established in 1909, on a small scale. It has since been enlarged until it now occupies an area of 120 acres. It is situated northwesterly from plaintiff's house, the distance from plaintiff's house to the nearest point of defendant's premises being about 600 feet. The main part of the oil refining plant, where the furnaces, stills, storage tanks and smokestacks are situated, is considerably farther distant from plaintiff's house. Across the street on both the north and west from plaintiff's house are vacant lots not owned by defendant upon which are dumped heaps of rubbish and waste materials. In the street west of plaintiff's house is an electric railroad track, and one block west is the roundhouse, shops, and yards of the Oregon Short Line Railroad Company. Within a few blocks north and northeasterly is situated a hospital, two public bathing resorts, a gravel pit or works, and a rock crusher, and just north of the rock crusher is the city estray pound and crematory. Between the plaintiff's house and the defendant's plant are two open waste ditches carrying overflow and waste sulphur water from the bathing resorts mentioned. The ground, especially north and west of plaintiff's house, is low and damp and is occupied generally for industrial and manufacturing purposes.

The operation of defendant's plant consists of the distillation and separation from crude oil of gasoline, kerosene, and lubricating oils. Crude oil is transported to the refinery in tank cars and is pumped thence either into storage tanks or into stills. By the application of heat through furnaces

at the bottom of the stills the crude oil is distilled into vapor, which is cooled and condensed through pipe coils, and at various stages gasoline, kerosene, oil, etc., are taken off. The works included numerous furnaces, smokestacks, stills, process and storage tanks, absorption plant, acid plant, etc. The refinery uses a closed system designed to confine and capture and to utilize and consume all acids, gases, and fumes and is maintained and conducted in accordance with modern standards and approved methods. About 360 men are regularly employed in the works. The average daily consumption of fuel is 80 tons of coal, 700 barrels of fuel oil, and 1,000,000 cubic feet of gas. The daily production is 110,000 gallons of gasoline and 150 barrels kerosene. Distances from the plaintiff's house to other relevant points are as follows: To the nearest process tank of defendants plant, 930 feet; to other and larger tanks, 1,100 to 4,520 feet; to the nearest stills on defendant's property, 1,270 feet (other stills are farther away); to the defendant's absorption plant, 2,500 feet; and to its acid plant, 3,430 feet; to the railroad roundhouse, 1,090 feet; to the estray pound and crematory, 2,130 feet. There is much coal smoke and soot in the locality coming from various sources.

The foregoing facts are uncontradicted.

The plaintiff's case was restricted to a complaint that her property was rendered uncomfortable and undesirable for residence purposes and thereby depreciated in value in consequence of gases, odors, and fumes being carried into and around it from defendant's plant. Excluding the opinion evidence of depreciated value and amount of damages, we excerpt the plaintiff's evidence relied upon to establish defendant's liability as follows:

Mrs. Benjamin Bytheway testified that she has lived a near neighbor to the plaintiff for 24 years; that during and since the year 1921, she has observed fumes from the operation of the oil works, fumes, she thought, were from an acid tank; that it was something disagreeable, a strong

odor, had a kind of sting in it, and woke her up at nights and she had to get up and close the doors and windows; that she was sensitive and did not sleep well; that she knew of the plaintiff closing her doors and windows when the fumes were coming; that the fumes occurred every week and sometimes twice a week and lasted from an hour and a half to two or three hours, that a few years ago it used to make her quite sick, but she had lived there so long that she was getting used to it; that it was disagreeable at any time but sometimes it was more offensive; that she could see a kind of bluish vapor that goes up; that she could smell some of the fumes every day, but about two or three times a week they were offensive like they were cleaning out some stills; that across the street north from where the plaintiff and witness live is a vacant lot which is flooded every time the pool in the bathhouse is emptied; that the water stands there in a pool and overflows and gives off a disagreeable, sulphury, sickening smell; that a flume had been put in lately and that now the odor from the water does not travel as far as her house; that the fumes and the smoke and the fear of the oil works made her home uncomfortable.

Oscar Mark Olsen testified: That for ten years he had lived a few rods east of the plaintiff's house; that he noticed gas or odor from the oil plant about three or four times a week. That it was "just like you were frying beefsteak or round steak; it is the same kind of an odor only very strong. We put our windows down, shut the doors, and it will creep in anyway. You can't keep it out, and in the summer time it is terrible. We would rather enjoy the heat inside than to enjoy that odor by having the windows open." "We have to keep our windows and doors shut, not 24 hours a day, but just when it is at its most, and then we open them up, and then when it comes again we close them again, and we have had that to contend with for years." That he has known of times when the odor lasted all day and at other times for three or four hours.

Miss Elva Dahl, a daughter of the plaintiff, testified: That she had lived with her mother during the last 15 years and had been disturbed by fumes from the oil works. That she noticed the fumes early in the morning when going to work. "It is terrible. You have to put your handkerchief to your nose to keep from smelling those terrible fumes." That the "fumes come into the house at night during the summer time and wakes us up, and we have to get up and close the doors and windows." That the condition has been worse since 1921. That she noticed fumes particularly in the mornings on her way to work, not every morning but four or five times per week. "It smells like rotten eggs— it is the rottenest smell you ever smelled in your life." That she never smelled rotten eggs. That it does not smell like a decaying or rotting thing. That it more like gas. That she was not at home long enough to know how long the smell lasts. That she noticed the smell three or four times a week in the mornings when she left home and at nights when she returned. That lots of times she did not notice it. "When the windows are down you can't smell it in the house. Many a time have we had to close the doors and windows in the summer, that stench is so bad, * * * and it has been so hot in the house we have had to lay on the floor to keep cool. Living this way we have all been as healthy as anybody."

Hilda Dahl, the plaintiff, testified: "First moved into house 41 years ago, and lived there continuously since except for 16 years when the property was rented. Have lived there the last 15 years. During the last five years have noticed the odor from the oil works. Don't think it has affected me so much, for I am well anyway, but I don't think it is good for anybody's health. The odor is bad. It is not constant. It comes pretty often, but not every day. Have felt it more last winter and this winter. In summer time it is pretty bad because the windows are open. In winter the doors and windows are shut, and you don't get it unless you go outside. It affects me so I want to have

the doors and windows shut. I don't particularly get sick or like that, but it is something I would not like to have very often if I can help it. It will waken me up at night if the windows are open. The odor sometimes comes with the smoke. If I keep my doors and windows locked and I am in the house, I am all right. The fear of fire from the plant caused me to bring this suit. Except for that fear I would be content. The odor is a funny smell to me. It might be gas, but I don't take it that way. There is something besides gas in that smell. It comes daily sometimes, but not all the time. Sometimes it lasts a short while, but it can last a good long while at other times. I think it comes four or five times a week for all I know. I expect it is something they are burning over there, different rubbish, or something they burn to make that smoke. It is some rubbish from oil and things, I guess, that makes that smoke, else I don't know what it would be. Never investigated to find out where odor comes from except that it was brought over from the oil works. Don't think odor is good on anybody, or is anything to improve the health. Don't know that it has hurt me, and don't think it has hurt my children in any way."

Niels Rasmussen testified: "Am a son of the plaintiff and reside in Sanpete county. Have visited at mother's place occasionally the last two years, at which times noticed odors in her house coming from the operation of the oil works. It is a very bad smell. At times it is almost unbearable. Have slept in mother's house many times during the last three years. At times the odor has been so bad that they had to get up and close the windows and doors and then even taste it."

Mrs. Nettie M. Pulley testified: Lived near neighbor to plaintiff on same block for 10 or 11 years. While living there noticed odor emanating from the refining plant. "I thought it always contained a sort of acid smell, and it was very nauseating." Experienced odor maybe four or five times a week. "I never noticed how long it would continue.

I never took any particular notice. Have been asleep when it came on and have had it waken me."

Other than as indicated above, the plaintiff offered no proof or explanation of the particular place where odors complained of originated or how they were created. At the trial the plaintiff's attorney stated that no claim was made that the fumes or odors complained of were injurious to health.

The defendant produced evidence showing in great detail the plan and construction of its works and manner of its operation, and especially its process of confining, capturing, and consuming all fumes, gases, etc., all going to show that no fumes, gases or offensive odors could be or were discharged therefrom. Expert witnesses who had made thorough observations and experiments over prolonged periods for the purpose, and other witnesses living close to the plant testified that no offensive gases, fumes, or odors emanated from the refinery; that the only odor there present was an ordinary odor of oil, which is common and usual in many public places.

Of course, if the plaintiff's evidence, considered alone, made out a clear case of liability, it would be of no legal consequence, after verdict, that it was contradicted. But as the main question of liability here is a question of degree and dependent upon all the circumstances, the contradiction of plaintiff's evidence is proper to be stated.

The plaintiff relies upon the general doctrine of nuisance as defined by statute, Comp. Laws Utah 1917, § 7240:

"Anything which is * * * an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action. Such action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by the nuisance; and by the judgment the nuisance may be enjoined or abated, as well as damages recovered."

Also Comp. Laws Utah 1917, § 8185, defining a public nuisance to be:

"Doing any act, or omitting to perform any duty, which act or omission either: (1) Annoys, injures, or endangers the comfort, repose, health, or safety of three or more persons."

Plaintiff also cites and relies upon *Kinsman* v. *Utah Gas & Coke Co.*, 53 Utah 10, 177 P. 418; *Thackery* v. *Union Portland Cement Co.*, 64 Utah 437, 231 P. 813; *McCleery* v. *Highland Boy Gold Min. Co.* (C. C.) 140 F. 951; *Green* v. *Sun Co.*, 32 Pa. Super. Ct. 521; notes 9 L. R. A. (N. S.) 695, 20 L. R. A. (N. S.) 466, 31 L. R. A. (N. S.) 899, 3 A. L. R. 312; *Millett* v. *Minnesota Crushed Stone Co.*, 145 Minn. 475, 177 N. W. 641, 179 N. W. 682. The legal principles applied in these cases are not open to question. The right to recover damages for injuries occasioned by fumes, gases, dust, smoke, foul air, etc., being cast upon one's property by another, in proper cases, is well established. But the rule of liability is not absolute and the law does not afford redress for every such discomfort or annoyance. Extreme rights in this regard cannot be enforced. Of necessity some degree of inconvenience and annoyance must be endured or community and social life would be impossible. It thus follows that what constitutes in law an actionable nuisance is always a question of degree. The cases cited and relied on by the plaintiff are instances where, under all the circumstances, the use of the property complained of was held unreasonable. Here, where the facts and circumstances, both with respect to the origin and nature of the thing complained of and the degree of its offense, differ essentially from those of the cases cited, we have an entirely different legal question.

While a nuisance, in the ordinary sense in which the word is used, is anything that produces an annoyance—anything that disturbs one or is offensive—in legal phraseology it is applied to that class of wrongs that arise from the unreasonable, unwarrantable, or unlawful

use by a person of his property. Every person has the right to the reasonable enjoyment of his property. As to what is a reasonable use of one's property must necessarily depend upon the circumstances of each case, for a use for a particular purpose and in a particular way, in one locality, that would be lawful and reasonable might be unlawful and a nuisance in another. 1 Wood on Nuisances (3d Ed.) §§ 1, 2. The test of whether the use of the property constitutes a nuisance is the reasonableness of the use complained of in the particular locality and in the manner and under the circumstances of the case. 29 Cyc. 1156. A business which might be perfectly proper in a business or manufacturing neighborhood may be a nuisance when carried on in a residential district; and, conversely, a business which with its incidents might be considered a nuisance in a residential district may be proof against complaint where conducted in a business or manufacturing locality, although an extraordinary use of property introducing a serious annoyance which directly and substantially damages the property of another or causes unnecessary annoyance to persons in the vicinity is not justified by the fact that the place is a manufacturing locality. 29 Cyc. 1157, 1158.

"The law relating to private nuisances is a law of degree, and usually turns on the question of fact whether the use is reasonable or not under all the circumstances. No hard and fast rule controls the subject, for a use that is reasonable under one set of facts would be unreasonable under another. Whether the use of property to carry on a lawful business, which creates smoke or noxious gases in excessive quantities, amounts to a nuisance, depends on the facts of each particular case. 21 Am. & Eng. Enc. Law (2d Ed.) p. 692. Location, priority of occupation, and the fact that the injury is only occasional, are not conclusive, but are to be considered in connection with all the evidence, and the inference drawn from all the facts proved whether the controlling fact exists that the use is unreasonable. If that fact is found a nuisance is established, and the plaintiff is entitled to relief in some form. Unless that fact is found, or it is an inference of law from other facts found, no nuisance is established, even if the plaintiff shows that he has suffered some damage, annoyance, and injury. Those evils are at times incidental to civilized life, and the

sufferer finds compensation in the arts and agencies of civilized society. *Campbell* v. *Seaman* [63 N. Y. 568, 20 Am. Rep. 567], supra. What is reasonable is sometimes a question of law and at others a question of fact. When it depends upon an inference from peculiar, numerous, or complicated circumstances, it is usually a question of fact. Whether the use of property by one person is reasonable, with reference to the comfortable enjoyment of his own property by another, generally depends upon many and varied facts, such as location, nature of the use, character of the neighborhood, extent and frequency of the injury, the effect on the enjoyment of life, health, and property, and the like." Vann, J., in *McCarty* v. *Natural Carbonic Gas Co.*, 189 N. Y. 40, 81 N. E. 549, 13 L. R. A. (N. S.) 465, 12 Ann. Cas. 840.

"What amount of annoyance or inconvenience caused by others in the lawful use of their property will constitute a nuisance, is largely a question of degree depending on varying circumstances, and is incapable of exact definition. [Citing cases.] The injury or annoyance must be of a real and substantial nature, and the pertinent inquiry ordinarily is whether the acts or conduct proved are such as materially to interfere 'with the ordinary comfort, physically, of human existence,' or are materially detrimental to the reasonable use, or value of the property [citing cases]." *Cumberland Corporation* v. *Metropoulos*, 241 Mass. 491, 135 N. E. 693.

"It is a matter of common knowledge that in thickly settled manufacturing communities, the atmosphere is inevitably impregnated with disagreeable odors and impurities. This is one of the annoyances and inconveniences which every one in such a neighborhood must endure. Mere discomfort caused by such conditions without injury to life or health cannot be ruled as matter of law to constitute a nuisance. Each case must depend upon its own facts and no rule can be formulated which will be applicable to all cases." *Strachan* v. *Beacon Oil Co.*, 251 Mass. 479, 146 N. E. 787.

In applying the foregoing legal principles to the case at bar, we must take into consideration the facts as shown by the uncontradicted evidence that the defendant's oil refinery is a lawful, useful, and necessary business, and is situated in the industrial or manufacturing section of the city; that it is a modern, well-equipped plant and is conducted in a careful manner and according to approved methods; that it is not in close proximity to the plaintiff's house but at a substantial distance (1,000 feet

or more) therefrom. There is no claim that the defendant, by any careless or extraordinary or unnecessary use of its property, produces the injury complained of. The sole ground of complaint is that offensive and disagreeable fumes or odors emanate from the refinery and are carried through the air to the plaintiff's house. It is admitted that the odors are not constant and are not injurious to life or health, and it is obvious that they cause no direct or physical injury to property. The extent of the offense claimed is that the odors are disagreeable and unpleasant and have at times wakened persons sleeping in plaintiff's house and required them to shut doors and windows. In these circumstances we are unable to say as a matter of law that a case of unreasonable use or actionable nuisance was made out. See *Strachan* v. *Beacon Oil Co.* supra; *Petroleum Refining Co.* v. *Commonwealth,* 192 Ky. 272, 232 S. W. 421. No precedent for sustaining liability under similar circumstances has been cited, and we have found none. The essential facts with respect to the nature, locality, and manner of use of defendant's plant, and the situation with reference thereto of the plaintiff's house, and the degree and extent of the plaintiff's annoyance and discomfort, are so clear that the question presented is one of law. We therefore conclude that the trial court erred in not directing a verdict for defendant and in denying defendant's motion for a new trial.

The judgment is reversed and a new trial granted. Costs to appellant.

THURMAN, C. J., STRAUP and HANSEN, JJ., and PARKER, District Judge, concur.

PARKER, District Judge, sat in lieu of FRICK, J., absent on account of illness.